**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| United States of America, | |
| *Plaintiff*, | |
| v. | |
| Thomas Lindstrom, | |
| *Defendant*, | No. 16 CR 631 |
| | Judge Lindsay C. Jenkins |
| David Venkus, | |
| *Restitution Judgment Creditor*, | |
| and | |
| Ryan Building Group, Inc., | |
| *Third-Party Citation Respondent* | |

**MEMORANDUM OPINION AND ORDER**

In 2019, Defendant Thomas Lindstrom was sentenced for one count of wire fraud and ordered to pay $13,776,518 in restitution to the victim of his crime, David Venkus. Venkus served a citation to discover assets on Lindstrom's then-employer, Ryan Building Group, Inc. Before the Court is Venkus' motion for a finding of contempt and entry of judgment against RBG for transferring funds in violation of the citation to discover assets. For the reasons below, Venkus' motion is denied.

## I.    Background

### A.    Lindstrom's Employment and Sentencing

This motion arises out of a victim's attempt to recover restitution through civil proceedings. Defendant Thomas Lindstrom worked for Ryan Building Group, Inc.

1

("RBG") from at least July 1, 2015 until October 9, 2023. [Dkt. 123 at 3–4.] During his employment, Lindstrom acquired stock options pursuant to a Stock Options Agreement. [*Id.*] His agreement, which was also subject to the terms and conditions of RBG's 2014 Stock Incentive Plan, allowed him to exercise his options if he (1) provided written notice; (2) paid the exercise price; and (3) satisfied other requirements "as may be prescribed in the Award agreement." [Dkts. 123-2 at 2; 123-3, § 6(c)(iii).] It also specified that in the event of termination, his unexercised options would expire after 30 days. [*Id.* at § 8(b)(ii); Dkt. 123 at 3, 5.] By the end of his employment, Lindstrom acquired 116,666 vested stock options worth an estimated $445,633. [Dkts. 123 at 3; 123-6.]

Lindstrom also amassed substantial debts to RBG during his employment. Between 2016 and 2017, Lindstrom either borrowed or misappropriated $230,000 from RBG to fund his criminal defense for this case, which began in September 2016.[1] [Dkts. 1; 123 at 3.] Lindstrom and RBG signed two promissory notes memorializing the debt.[2] [Dkt. 123 at 3.] On January 23, 2019, the Court sentenced Lindstrom to 60-months for wire fraud. [Dkt. 54.] RBG rehired Lindstrom after his sentence. Lindstrom began using his company credit card for personal expenses totaling

---

[1] RBG claims the funds were "misappropriated" while Lindstrom represented that he "borrowed" them. [Dkt. 127 at 8.]

[2] Venkus initially argued that Lindstrom failed to provide enough evidence of the debt and that copies of promissory notes were insufficient. [Dkt. 122 at 12.] However, a "duplicate is admissible to the same extent as the original unless a genuine issue is raised about the original's authenticity," Fed. R. Evid. 1003, and Venkus hasn't given the Court any reason to doubt the promissory notes' authenticity. Additionally, the precise amount of debt Lindstrom owed to RBG is immaterial given the Court's conclusion that RBG's calculation of the severance package based on the value of the stock options was gratuitous. *See infra* Part III.A.

$69,010. RBG spent $10,000 on an accountant to uncover the fraud, and later terminated Lindstrom in October 2023. [Dkt. 123-1, ¶¶ 12–15.] By the end of his employment, Lindstrom owed RBG $372,544, including debts plus interest. [Dkt. 123 at 9.]

### B.    Restitution Dispute

At sentencing, Lindstrom was ordered to pay $13,776,518 in restitution to the victim of his fraud, David Venkus. Venkus obtained an abstract of judgment to enforce the restitution award as a civil judgment creditor, and the Court granted his motion to enforce the judgment. [Dkts. 54, 69.]

In August 2022, Venkus served a citation to discover assets on RBG to identify, and then obtain, assets it held owed to Lindstrom in order to satisfy the judgment. [Dkt. 122-1 at 1–3.] The citation contained a restraining provision prohibiting RBG from transferring assets in its possession owed to Lindstrom. [*Id.* at 1; 735 Ill. Comp. Stat. 5/2-1402(f)(1); *see infra* Part II.] RBG answered the citation, indicating that it possessed earnings owed to Lindstrom and certain stock options. [Dkt. 77 at 6–8.] Under Illinois law, creditors are only allowed to collect up to 15% of unpaid wages. 735 Ill. Comp. Stat. 5/12-803. Accordingly, Venkus moved for a turnover order for Lindstrom's nonexempt wages. In the motion, Venkus "reserve[d] his right to seek relief as to the stock options identified by [RBG]." [Dkt. 77 at 2 n.2.] In September 2022, the Court entered the turnover order, which required RBG to deliver 15% of Lindstrom's gross earnings to Venkus. [Dkt. 82, ¶ 6.]

RBG sent Venkus 15% of Lindstrom's wages until October 2023 when it terminated Lindstrom. RBG informed Venkus that Lindstrom was no longer

employed as of October 9, 2023, and that it was "still working out any severance that needs to be paid out." [Dkt. 122 at 3–4.] Venkus inquired about Lindstrom's severance multiple times between October and January 2024 but RBG's responses were delayed and lacked detail. [Dkts. 122 at 3–4; 123 at 6.] Between December and January 2024, RBG sent Venkus additional funds, $10,963 of which it stated was the amount due from Lindstrom's severance, without explaining how it was calculated. [Dkt. 122 at 4.] After additional information demands and disputes, the Court ordered RBG to produce documents and information, including about Lindstrom's severance and promissory notes. [Dkts. 103; 122 at 5.]

Around this time in January 2024, Venkus obtained from Lindstrom a document Lindstrom made with RBG entitled "Ryan Building Group – Tom Lindstrom Options Net Payout" ("December 2023 Document"). [Dkts. 122 at 5–6; 123-1 at 25.] Lindstrom signed and dated it December 15, 2023. The document, which appears to calculate Lindstrom's options net payout, also seems to represent Lindstrom's severance package given that RBG's explanation of how it calculated Lindstrom's severance matches the document. RBG explained:

> "Lindstrom received gross severance in the amount of $73,090. RBG calculated this amount by taking the amount that Lindstrom would have received had he exercised his stock options ($445,633) and subtracted amounts Lindstrom owed to RBG, including repayment of personal loan for which the options were collateral, totaling $372,543, for a gross severance in the amount of $73,090. Of that gross severance amount, RBG paid 15% ($10,963) to [Venkus] based on its understanding of the Court's turnover order (ECF 82) that RBG is required to pay 15% of amounts due to Lindstrom . . . RBG also paid 35% ($21,744) to [Lindstrom's ex-wife] pursuant to a letter of direction from Lindstrom in accordance with a domestic relations court order dated April 11, 2023. The remaining amount to be paid to Lindstrom is $40,382, half of which ($20,191) was paid to Lindstrom on December 31, 2023 [...]"

4

[Dkt. 122 at 6–7.]

Venkus filed this motion for § 2-1402(f)(1) liability and entry of judgment against RBG for wrongfully transferring severance pay that was encumbered by Venkus' citation lien to other creditors and to Lindstrom. [Dkt. 122 at 1.] According to Venkus, RBG agreed to pay Lindstrom the value of his stock options ($445,633) and then paid itself back the value of Lindstrom's debts before paying Venkus, even though Venkus' interest in the stock options was secured while RBG's was not. Venkus also argues that severance isn't subject to a 15% garnishment cap under Illinois law, so he should have received the full package. Each transfer of severance to Lindstrom and his ex-wife, who also lacked a secured interest, also then violated § 2-1402(f)(1). Venkus further argues that RBG's violations were willful and contumacious, entitling Venkus to attorney's fees for the cost of this motion.

## II.    Legal Standard

Section 2-1402 of the Illinois Code of Civil Procedure (735 Ill. Comp. Stat. 5/2-1402 (West 2020)) allows a judgment creditor to enter supplementary proceedings to discover a debtor's assets and compel their payment towards satisfaction of the judgment. To do this, the judgment creditor serves a citation to discover assets upon a judgment debtor or third-party respondent, pursuant to which the court enters a turnover order. *Id.* at § 2-1402(a)–(c). A citation to discover assets can, as it does in the RBG Citation, contain a restraining provision that "prohibit[s] the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of the judgment." *Id.*

5

at § 2-1402(f)(1); [Dkt. 122-1 at 1.] This provision aims to prevent the citation respondent "from transferring funds which may become due to the judgment debtor, in order to insure that the latter does not abscond with money that is due." *Cacok v. Covington*, 111 F.3d 52, 54 (7th Cir. 1997) (quoting *Kirchheimer Brothers Co. v. Jewelry Mine Ltd.*, 426 N.E.2d 1110, 1113–14 (Ill. App. Ct. 1981)). Once a citation is served on a respondent, a lien is perfected on the debtor's assets that are not otherwise exempt under the law, and is superior to any lien that later attaches. § 2-1402(m); *Sign Builders, Inc. v. SVI Themed Constr. Sols., Inc.*, 30 N.E.3d 475, 479 (Ill. App. Ct. 2015); *Cacok*, 111 F.3d at 54.

Courts may punish any citation respondent who violates the restraining provision "as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser." § 2-1402(f)(1); *see also* Ill. Sup. Ct. R. 277(h) (describing sanctions for failing to obey a citation, subpoena, or order or other direction of the court); *Midwest Com. Funding, LLC v. Kelly*, 217 N.E.3d 985, 992 (Ill. 2022) ("[I]ssuance of a citation [to discover assets] imposes very real restrictions and affirmative duties upon a third party—backed by the threat of contempt and monetary liability." (quoting *Shipley v. Hoke*, 22 N.E.3d 469, 483 (Ill. App. Ct. 2014))).

For § 2-1402(f)(1) liability to attach, Venkus must show that (1) he has an enforceable judgment, (2) he properly served a citation upon RBG, and (3) RBG transferred assets in violation of the citation's restraining provision. *Mendez v.*

6

*Republic Bank*, 725 F.3d 651, 663 (7th Cir. 2013). Venkus, as the judgment creditor, also bears the burden of showing that RBG had assets belonging to Lindstrom. *Cent. States, Se. & Sw. Areas Pension Fund v. Vanguard Servs., Inc.*, 498 F. Supp. 3d 988, 995 (N.D. Ill. 2020). If Venkus can show RBG violated § 2-1402(f)(1), the Court may also impose sanctions for contempt. *Mendez*, 725 F.3d at 662; *Shales v. T. Manning Concrete, Inc.*, 847 F. Supp. 2d 1102, 1118–19 (N.D. Ill. 2012) (imposing civil contempt sanctions on third-party citation respondent in the form of attorney's fees for violating § 2-1402(f)(1)); *Star Ins. Co. v. Risk Mktg. Grp. Inc.,* 561 F.3d 656, 663 (7th Cir. 2009) ("Under [Illinois Supreme Court] Rule 277, the court ha[s] the discretion as to the nature of the sanction to impose for violating the order.").

## III. Analysis

The parties don't dispute that Venkus had an enforceable judgment, that it properly served a citation on RBG, or that Venkus was entitled to some portion of Lindstrom's severance package. The parties only dispute the value of Lindstrom's severance package and what portion of it is statutorily due to Venkus under the Illinois Wage Deduction Act, 735 Ill. Comp. Stat. 5/12-801 *et seq*. According to Venkus, RBG underpaid him from the severance package and transferred the remaining funds in violation of § 2-1402(f)(1). RBG allegedly did so willfully and contumaciously, warranting sanctions in the form of attorney's fees. RBG claims that it paid Venkus the correct amount of severance and so did not violate § 2-1402(f)(1). The Court takes each issue in turn. Because it does not find evidence of a § 2-1402(f)(1) violation, sanctions are not appropriate.

### A.      Value of Lindstrom's Severance Package

First, the Court must determine the value of the severance package owed to Lindstrom. Only then can it determine what portion of the package was statutorily due to Venkus and whether RBG violated the citation to discover assets. As the judgment creditor, Venkus must "prove by a preponderance of the evidence that the alleged contemnor has violated a court order." *Bank of Am., N.A. v. Freed*, 971 N.E.2d 1087, 1093 (Ill. App. Ct. 2012) (internal quotation marks omitted). This includes proving that RBG held assets owed to Lindstrom. *Cent. States, Se. & Sw. Areas Pension Fund*, 498 F. Supp. 3d at 995. For assets to belong to a creditor, they must be "held under such circumstances that in an action" by the debtor, the creditor could "recover them in specie or obtain a judgment for the proceeds." § 2-1402(c)(3). In other words, Venkus can only recover what Lindstrom could recover.

The dispute over the severance due to Venkus derives from Lindstrom's stock options agreement and the December 2023 Document. RBG's citation response identified Lindstrom's stock options and thereby gave Venkus a lien right to the options, which was perfected when it was served on RBG. § 2-1402(m). It's undisputed that Lindstrom never exercised his options per the terms of his agreement. But the December 2023 Document nevertheless calculates Lindstrom's severance starting with the value of Lindstrom's options. The document lists the net value ($445,633) at the top,[3] then the debt Lindstrom owed to RBG ($372,543), and then calculates the remaining sum ($73,090) and apportions it between Lindstrom and his creditors. The

---

[3]      The net value is the value of the shares minus the exercise price for the options. [Dkt. 123-1, ¶ 21.]

question is whether Venkus had a right to the entire $445,633, or whether the severance package is actually worth $73,090.

RBG argues that $73,090 is the value of the package that it agreed to pay out. It's reason is simple: Lindstrom's options expired on November 8, 2023, 30 days post-termination (per the terms of his agreement) and before the severance package was calculated. Lindstrom had no right to exercise his options after November 8, 2023, therefore Venkus also has no right to the value of the stock options. According to RBG, the prior value of the now-expired options was merely a hypothetical starting point to calculate what RBG felt was a "fair" severance. [Dkt. 123 at 5.]

Venkus argues that it's entitled to the entire $445,633 because RBG's citation response identified the stock options and therefore gave Venkus a lien on them. RBG, therefore, was prohibited from offsetting Lindstrom's debt before paying Venkus because RBG didn't have a secured interest in the options. [Dkt. 127 at 10.] These arguments are no answer to the assertion that Lindstrom's options were expired and unexercised before December 2023. Venkus is correct that the citation gave it a lien right to Lindstrom's stock options. § 2-1402(m) (citation directed against third-party becomes a lien on debtor's personal property including "money, choses in action, and effects of the judgment debtor"). But Venkus hasn't show how a lien interest would survive the extinguishment of property rights pursuant to a valid agreement that preexisted the citation. *See, e.g.*, *Schwartz v. Yo-Whip, Inc.*, 1994 WL 549002, at *2–3 (N.D. Ill. Oct. 5, 1994) (terms of agreement preexisting citation to discover assets allowed assignee to terminate debtor's interest in patent assets, altering lien rights

of creditors). RBG's 2014 Stock Incentive Plan, which Lindstrom's agreement incorporates, clearly states that an employee's vested options "cease to be exercisable and will terminate" 30 days after the termination date. [Dkt. 123-3 at § 8(b)(ii).] RBG had an undisputed right to terminate Lindstrom. By the terms of the agreement, then, Lindstrom lost the right to obtain any real value from the options, therefore Venkus logically lost that right as well. The expired options, then, had no value.

To get around this, Venkus argues that the December 2023 Document is a legally binding agreement the shows the options still had monetary value owed to Lindstrom. He points to the fact that the underlying spreadsheet is entitled "Lindstrom Options Release Agreement," that John Rushin, the RBG employee who created the document, emailed it to Lindstrom directing him to sign it, and Lindstrom did sign, below text reading "Agreed as above." [Dkt. 127 at 13–14.] The "agreement," Venkus says, shows that RBG offset its debts against the value of Lindstrom's options, "mak[ing] it near impossible for RBG or Lindstrom to sue one another for the debts offset . . . ." [*Id.* at 14.] Consequently, the "agreement" shows that Lindstrom's options still had monetary value. [*Id.* at 12–14.] RBG counters that the document depicts a hypothetical valuation of the options to find "fair" severance and isn't a legal agreement because there's no consideration and RBG didn't sign it. [Dkt. 123 at 6 n.2, 13–14.]

The latter is more persuasive. The December 2023 Document has some hallmarks of an agreement—RBG asked Lindstrom to sign it, he did sign, and then RBG paid out the sums in line with the document. But Venkus hasn't presented

persuasive evidence of consideration, a crucial component of a legal agreement. *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011) ("Under Illinois state law, an enforceable contract requires an offer, acceptance, consideration, and mutual assent."). Venkus states that RBG and Linstrom obtained a mutual release of debts against each other—RBG for the stock options, and Lindstrom for his debts. But the options had already expired, so RBG didn't owe Lindstrom their value. Additionally, a promise to repay debt already owed cannot furnish consideration for a new agreement. *DiLorenzo v. Valve & Primer Corp.,* 807 N.E.2d 673, 679 (Ill. App. Ct. 2004). Instead, the net payout calculation appears to be a gratuitous estimation of severance.

Venkus also argues that the strange circumstances surrounding the December 2023 Document confirm that Lindstrom's options had value. Why, Venkus asks, would RBG decide to pay Lindstrom after he stole from RBG twice? Why would Lindstrom walk away from a huge sum and let his options expire while still owing RBG money? And why would RBG undertake this hypothetical exercise if it could have simply written Lindstrom a check for $73,090 or some other value? The truth, Venkus contends, is that RBG knew Venkus' lien on the options was a problem because RBG never perfected its interest in the options. RBG realized Venkus would be entitled to the entire sum of the options once exercised, so it tried to convince the Court that the severance calculation was a "grand hypothetical exercise" while "silently direct[ing] [Lindstrom's] stock option assets to his favored creditor, RBG, over his disfavored creditor, Venkus." [Dkt. 127 at 10–12.]

11

This account doesn't entirely hold water because Lindstrom's severance was subject to a wage garnishment cap under the Illinois Wage Deduction Age. *See infra*, Part III.B. Even if Venkus garnished $445,633, there would be sufficient funds remaining to repay Lindstrom's debt to RBG. But even if RBG acted contrary to its own economic interests by paying Lindstrom funds that it may not have owed him, Venkus' claim that their relationship was "corrupt" instead of altruistic is speculation without more. [Dkt. 127 at 7.] It also doesn't change the fact that Lindstrom's options had expired, extinguishing his right to exercise them.

The outcome might be different if Venkus presented evidence that RBG purposely frustrated Venkus' ability to recover assets due to him. *See In re Emerald Casino, Inc.*, 584 B.R. 727, 736 (N.D. Ill. 2018) ("Where . . . a judgment debtor transfers assets to another with the actual intent to hinder, delay, or defraud any creditor of the debtor, Illinois law permits the creditor to collect those assets to satisfy the judgment." (internal quotation marks omitted)). Venkus does state in one sentence that "RBG never gave Venkus the opportunity to exercise the options and obtain their value." [Dkt. 127 at 12.] But he failed to explain how RBG prevented him from recovering the value of the options. To the contrary, the evidence presented indicates that Venkus knew Lindstrom had a certain quantity of vested stock options and knew when the options would expire but took no action to recover their value. Venkus received Lindstrom's Stock Options Agreement in October 2022, a year before his termination. [Dkt. 122 at 3.] The Agreement references RBG's 2014 Stock Incentive Plan, which explains the terms of expiration. Venkus didn't claim that he

12

lacked information about the Stock Incentive Plan, so Venkus was presumably aware the options would expire on or about November 9, 2023. RBG also told Venkus that Lindstrom had 116,666 vested stock options. [*Id.*] Yet Venkus only sought turnover of Lindstrom's wages. It "reserve[d] his right" to the stock options but never moved to recover their value even though they were set to expire. [Dkt. 77 at 2 n.2.] It's true that Venkus didn't know how much the options were worth until after they expired, but it still had notice and opportunity to pursue them. In sum, the Court finds that Lindstrom's options expired before RBG calculated his severance. Venkus therefore didn't have the right to recover the value of his stock options. The severance package RBG agreed to pay is $73,090.

### B.     Severance Due Under Illinois Wage Deduction Act

The next question is whether RBG paid Venkus the correct portion of the $73,090 severance package or if it violated § 2-1402(f)(1) by sending unwarranted severance payments to Lindstrom or his ex-wife. RBG argues that Venkus was only entitled to 15% of the package under § 12-803 of the Illinois Wage Deduction Act. Venkus contends it was entitled to the entire sum.

The Illinois Wage Deduction Act ("IWDA") caps the percent of wages that can be garnished by a creditor pursuant to a deduction order. 735 Ill. Comp. Stat. 5/12-801 *et seq.* (West 2020). Turnovers pursuant to a citation to discover assets in a supplementary proceeding must treat "wages" as defined by the IWDA in line with its provisions, including the garnishment cap. § 2-1402(k-5). "Wages" are defined as "any hourly pay, salaries, commissions, bonuses, or other compensation owed by an

employer to a judgment debtor." § 12-801. Section 12-803 is the wage exemption provision, stating in relevant part:

> "Wages, salary, commissions and bonuses subject to collection under a deduction order, for any work week shall be the lesser of (1) 15% of such gross amount paid for that week or (2) the amount by which disposable earnings for a week exceed 45 times the Federal Minimum Hourly Wage prescribed by Section 206(a)(1) of Title 29 of the United States Code, as amended, or, under a wage deduction summons served on or after January 1, 2006, the minimum hourly wage prescribed by Section 4 of the Minimum Wage Law, whichever is greater, in effect at the time the amounts are payable . . . The term 'disposable earnings' means that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld."

The parties agree that severance is "wages" under the IWDA, but dispute whether it's subject to the 15% wage garnishment cap. RBG argues that all "wages" fall under § 12-803 without exception, such that Venkus is only entitled to 15% of Lindstrom's severance package. Venkus argues that § 12-803 only applies to wages that are paid periodically. Lindstrom's lump severance payment was not periodic, so Venkus is owed the entire sum. [Dkts. 122 at 10–11; 123 at 10–13; 127 at 3–7.]

This is purely a question of state statutory interpretation, so Illinois' rules of statutory construction apply. *Green v. Leibowitz*, 108 F.4th 530, 533 (7th Cir. 2024). In Illinois, "[t]he primary objective of statutory construction is to ascertain and give effect to the intent of the legislature." *People v. Fair*, 238 N.E.3d 1119, 1132 (Ill. 2024). "The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning." *Id.* at 1132–33. When assessing legislative intent, courts should "view the statute as a whole, construing words and phrases in connection with other relevant statutory provisions rather than in isolation." *Id.* at

14

1133. If the statute's language is clear, it "should be enforced as written." *Dawkins v. Fitness Int'l, LLC*, 210 N.E.3d 1184, 1190 (Ill. 2022). Otherwise, courts may also consider "the reason for the law, the problems to be remedied, and the objects and purposes sought." *Id.* Relevant here, Illinois has long recognized that personal property exemption statutes should be liberally construed to protect debtors. *Matter of Barker*, 768 F.2d 191, 196 (7th Cir. 1985); *Kauffman v. Wrenn*, 46 N.E.3d 805, 817 (Ill. App. Ct. 2015).

Few cases interpret § 12-803 and none address periodicity with respect to lump-sum severance.[4] The Court reviews this issue with fresh eyes, beginning with the plain language of the statute. Venkus argues that §12-803's periodicity requirement is baked into the language: the statute caps wage deduction "*for any work week*" at the lesser of "15% of such gross amount paid *for that week*" or "the amount by which disposable earnings *for a week* exceed 45 times the Federal Minimum Hourly Wage . . . ." § 12-803 (emphasis added). Venkus implies that the statute's repeated reference to wages paid on a weekly basis means the exemption only applies to wages paid periodically. But the Court isn't convinced it's that clear. Although the exemption identifies weekly wages, in practice, courts apply the payment period relevant to a debtor's wages, which might be paid biweekly or monthly. *See, e.g.*, *Cooper v. City of Chi.*, 2018 WL 3970141, at *16 (N.D. Ill. Aug. 20,

---

[4]     As the parties note, *Matter of Burciaga* recently addressed § 12-803. 944 F.3d 681 (7th Cir. 2019). The issue was whether the IWDA applies to bankruptcy proceedings. Holding that it does, the Court also held that vacation pay (the assets at issue), as "a form of wages," is subject to § 12-803. *Id.* at 685. *Burciaga* is inapplicable because parties agreed that § 12-803 applies to all wages, so the Court had no occasion to consider periodicity.

2018) (entering writ of execution to garnish monthly wages); *Columbia Coll. Chi. v. Cheesecake Factory, Inc.*, 2016 IL App (1st) 161058-U, ¶ 29 (comparing biweekly wage to federal hourly minimum wage). The question remains: what wages does § 12-803 apply to? Only wages paid periodically, or also those paid once? That the statute references weekly wages doesn't provide a definitive answer. This conclusion is supported by the fact that cases interpreting similarly worded wage exemption provisions haven't relied on those provisions' references to "weekly" wages to determine whether they apply to lump-sum payments, or even mentioned them as a determining factor. *See, e.g.*, *United States v. Sayyed*, 862 F.3d 615 (7th Cir. 2017) (federal wage exemption provision excludes lump-sum payments based on definition of "earnings"); *Arrow S Credit Union v. Harrell*, 248 N.E.2d 312 (Ill. App. Ct. 1969) (state wage exemption provision excludes lump-sum payments based on definition of "gross wages").

Venkus also relies on *Arrow* for textual support. In *Arrow*, the Illinois Appellate Court interpreted a prior version of § 12-803, holding that it doesn't apply to lump-sum severance payments. But *Arrow* is inapplicable for two reasons. First, it based its decision on language no longer in § 12-803. In 1969, the statute capped wage deductions to the greater of "$45.00 per week" or "85% of gross wages, whichever is greater, but in no event to exceed $200.00 per week." It then defined "gross wages" as "total compensation received for services *rendered in a particular pay period* prior to any deductions whatsoever." Ill. Rev. Stat. 1965, Ch. 62, ¶ 73 (emphasis added). *Arrow* anchored its analysis on the "particular pay period" language, but this phrase

is noticeably absent from § 12-803. *Arrow's* reasoning is also unpersuasive. It relied on *Kroger Co. v. Blumenthal*, which held that severance isn't "wages" with respect to any pay period *subsequent* to termination and, consequently, a person may be entitled to unemployment compensation under the Unemployment Compensation Act even if they receive severance payments post-termination. 148 N.E.2d 734 (1958). *Arrow* overread *Blumenthal's* holding and—without explanation—concluded that severance is "clearly not wages" received for *any* "particular pay period." 248 N.E.2d at 313. To the contrary, *Blumenthal* recognized that severance is earned for services rendered during employment and, in the case of a lump-sum payment, for "one pay period." 148 N.E.2d at 737. *Arrow* has never been cited as authoritative or persuasive and its reasoning is unhelpful here.

Venkus hasn't identified and the Court hasn't located any other language in the IWDA suggesting that § 12-803 has a general periodicity requirement. The IWDA doesn't define "gross amount," and "disposable earnings" is defined broadly to include "earnings of any individual remaining" after deductions required by law. § 12-803. Venkus attempts to bolster its textual arguments using interpretations of the federal Consumer Credit Protection Act ("CCPA"), which restricts wage garnishment using very similar language. 15 U.S.C. § 1673; [Dkt. 127 at 6–7.] Venkus is correct that the Seventh Circuit has interpreted the CCPA to exclude lump-sum pension and retirement payments from its wage garnishment provision, but it's done so largely based on the statute's definition of "earnings," which explicitly references periodic payments. § 1672(a) ("earnings" are "compensation paid or payable for personal

17

services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes *periodic payments* pursuant to a pension or retirement program." (emphasis added)); *see Sayyed*, 862 F.3d at 619–20; *United States v. Lee*, 659 F.3d 619, 621 (7th Cir. 2011). That language doesn't appear in § 12-803 and the Illinois statute doesn't define "earnings." There's also an open question as to whether the CCPA's periodicity requirement is limited to pension and retirement funds. *See, e.g., United States v. Frank*, 8 F.4th 320, 334 (4th Cir. 2021). Consequently, the IWDA doesn't provide clear textual guidance about wage garnishment for lump-sum severance.

Lacking a textual mandate, the Court examines the IWDA's purpose. Although the statute doesn't explicitly define a purpose and the Court hasn't found informative legislative history, personal property exemptions on wage garnishment are traditionally intended to "secur[e] to a debtor the means to support himself or herself and his or her family, avoid destitution, and maintain a basic standard of living." 35 C.J.S. *Exemptions* § 2 (2024); *see also In re Porayko*, 443 B.R. 419, 426 (Bankr. N.D. Ill. 2010) ("State exemptions are intended 'to secure to the judgment debtor and his family the necessary shelter and personal property required for their welfare in times of difficult economic circumstances.'" (quoting *State Bank of Antioch v. Nelson,* 477 N.E.2d 77, 79 (Ill. App. Ct. 1985))); *In re Thum*, 329 B.R. 848, 855 (Bankr. C.D. Ill. 2005) ("The purpose of garnishment caps is to protect a wage earner living paycheck to paycheck from losing his entire earnings so that he is left destitute with no ability

18

to pay necessary family living expenses."). The CCPA's wage garnishment cap is motivated by the same purpose. *See Kokoszka v. Belford*, 417 U.S. 642, 650–51 (1974).

Even if the Court assumes that § 12-803 exists to ensure a debtor can pay necessary living expenses, its application to lump-sum severance payments still isn't clear. Venkus argues that "a lump-sum distribution 'is not akin to a periodic payment of compensation needed to support the wage earner and his family on a regular basis,'" and shouldn't be exempt. [Dkt. 127 at 6–7 (quoting *Sayyed*, 862 F.3d at 619).] But *Sayyed* only concerned "lump-sum distribution of *retirement funds*." 862 F.3d at 619 (emphasis added). Lump-sum *severance* is an open question. The CCPA for example, the only analogous statute Venkus identifies, is ambiguous. Recall that the CCPA defines "earnings" as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program." § 1672(a). From this language, courts agree that lump-sum pension and retirement payments aren't "earnings" because they aren't "periodic payments." But courts disagree about whether "periodic" applies to other lump-sum payments like severance, even though the CCPA explicitly serves to protect a debtor and his family from destitution. *See United States v. Ashcraft*, 732 F.3d 860, 863 n.4 (8th Cir. 2013) (noting that "[s]ome courts interpret [15 U.S.C. § 1672(a)] to mean that only periodic payments . . . can constitute 'earnings'" but that "[t]he statute Congress passed does not restrict itself to periodic payments."). The Fourth Circuit acknowledged this uncertainty and further considered that the CCPA's periodicity requirement might be limited to lump-

sum pension and retirement payments. *Frank*, 8 F.4th at 333–34. This would make sense, it explained, because irregular bonuses "and the like" clearly qualify as "compensation" and periodic retirement payments serve the CCPA's purpose (to support wage earners and their families). *Id.* But lump-sum retirement payments "that have often been invested for decades" are neither direct compensation nor needed to support a wage earner or his family on a regular basis. *Id.* The Fourth Circuit's reasoning assumes that exempt wages are not only those intended to regularly support a wage earner, but also those directly tied to compensation. The IWDA, like the CCPA, defines "wages" as various types of "compensation." § 12-801. Severance is arguably directly tied to compensation, [Dkt. 123 at 12–13], different from the liquidation of long-invested retirement funds, and might analogously be considered exempt under § 12-803. Consequently, the Court concludes that different interpretations of § 12-803 are possible.

Amidst this interpretive uncertainty, the Court is cognizant of another rule of Illinois statutory construction: that exemptions should be liberally construed in favor of the debtor. *Barker*, 768 F.2d. at 196 ("[W]here an exemption statute might be interpreted either favorably or unfavorably vis-á-vis a debtor, we should interpret the statute in a manner that favors the debtor."). The IWDA's purpose, like most exemption statutes, is presumably to protect debtors from destitution. This is further confirmed by the fact that it's even more debtor-friendly than the CCPA. Whereas the CCPA exempts 75% of wages, including periodic pension and retirement funds, from garnishment, the IWDA exempts 85% of wages and 100% of all pension and

20

retirement funds. *Compare* § 1673(a) *with* § 12-803–804. Because the IWDA is ambiguous with respect to a periodicity requirement, the Court interprets it in favor of debtors and finds that lump-sum severance payments are exempt under § 12-803. Consequently, RBG was required to pay Venkus only 15% of the $73,090 severance package ($10,963). RBG paid Venkus this amount, so it did not violate $2-1402(f)(1) when it transferred the remaining funds to Lindstrom and other creditors. Absent a § 2-1402(f)(1) violation, the Court cannot award attorney's fees or otherwise sanction RBG.

## IV.     Conclusion

For the reasons above, the Court finds that RBG paid Venkus the portion Lindstrom's severance package it was statutorily due based on 735 Ill. Comp. Stat. 5/2-1402 and subject to Illinois' wage garnishment cap under 735 Ill. Comp. Stat. 5/12-803. RBG did not violate § 2-1402(f)(1) and is not liable for attorney's fees or otherwise sanctionable. Venkus' motion [dkt. 121] is denied.

Enter: 16-cr-0631
Date:  February 18, 2025

_____
Lindsay C. Jenkins
United States District Judge